## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FRAY COLEMAN, | ) | |
| | ) | C.A. No. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | JURY TRIAL DEMANDED |
| CITY OF WILMINGTON, | ) | |
| OFFICE OF PUBLIC SAFETY, and | ) | |
| DEPARTMENT OF POLICE | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, Fray Coleman, brings a series of claims against Defendant, City of Wilmington, Office of Public Safety, Department of Police, of which the following is a statement:

## JURISDICTION AND VENUE

1.    This Court has original jurisdiction to hear this Complaint and adjudicate the claims stated herein under 28 U.S.C. §§ 1331and 1343, this action being brought under 42 U.S.C. § 1983 ("Section 1983"), the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), and the Civil Rights Act of 1991, Pub. L. 102-166, 105 Stat. 1071 (Nov. 21, 1991).

2.      Venue is proper in this judicial district pursuant to 28 U.S.C. §

1391(b)(2), because a substantial part of the events or omissions giving rise to this

case occurred in this judicial district.

## THE PARTIES

3.      Plaintiff, Fray Coleman, is an African-American female citizen of the

United States and a resident of this judicial district.

4.      Defendant City of Wilmington is a municipal corporation in the State

of Delaware.  The City of Wilmington, Office of Public Safety, Department of

Police, is an agency of defendant with a principal place of business is located at

300 N. Walnut Street, Wilmington DE 19801.

5.      At all times relevant to this action, defendant was an "employer"

within the meaning of Sections 1981 and 1983.

6.      The acts set forth in this Complaint were authorized, ordered,

condoned, ratified and/or done by defendant's officers, agents, employees and/or

representatives while actively engaged in the management of defendant's business

and pursuant to defendant's official policies and customs.

## BACKGROUND FACTS

7.      Ms. Coleman was employed by defendant as a Police Officer from

June 14, 1999, until January 3, 2023, when she was constructively discharged

because of her race.  Ms. Coleman was last employed as a Master Sergeant.

8.    In 2007, a friend of the biological father of MSgt. Coleman's daughter was shot in the chest while at an after-hours night club.  WPD detectives interviewed MSgt. Coleman about the shooting, and she advised them that an individual known as Ramadan was the suspect in the shooting, and that she would not be surprised if he were to be killed because of the shooting.

9.    In February 2008, Ramadan was shot and killed while at a local bar. WPD detectives interviewed MSgt. Coleman about the shooting of Ramadan, and she told them she had no information about the incident.

10.    MSgt. Coleman was not contacted by anyone from WPD from February 2008 through September 2022 regarding the Ramadan shooting.

10.    In or about September or October 2022, defendant hired Stephen Rizzo, then a retired Delaware State Police Trooper, and assigned him to investigate the WPD's cold cases.

11.    Shortly thereafter, Mr. Rizzo reopened the Ramadan murder case, and in late September 2022 interviewed MSgt. Coleman.  She told Mr. Rizzo that she did not remember much about the case.

12.    A few weeks later, Mr. Rizzo interviewed MSgt. Coleman again and told her that her recollections about the Ramadan case were inconsistent.  MSgt. Coleman told Mr. Rizzo that she did not have any information about Ramadan's murder, but Mr. Rizzo insisted that she knew more than she had said, and accused

her of withholding information because she was on Band A of the promotional list to Lieutenant.

13.     Mr. Rizzo interviewed MSgt. Coleman while she was on duty.  He told MSgt. Coleman that she was not a suspect, but at no time during either interview did he advise her of her Miranda rights or her rights under the Police Officer Bill of Rights.

13.     Mr. Rizzo did not advise MSgt. Coleman that she was free to leave the interviews at any time.  He is an employee of the City of Wilmington, not a sworn member of the WPD, and has no arrest powers.  No sworn member of the WPD was present during any of MSgt. Coleman's interviews.

14.     On December 5, 2022, defendant's then Chief of Police announced that he was resigning from the WPD.  Typically, because of such a resignation, there would be promotions and reassignments within the WPD.

15.     Despite her likely promotion and the fact that she had no information and was not a suspect in the Ramadan case, and despite the fact that it was not the policy or practice of the WPD to obtain a search warrant for the mobile phone of a witness or an interviewee with no information about the subject case, on December 7, 2022, the Delaware Department of Justice (DDOJ) obtained the issuance of a Search Warrant for MSgt. Coleman's mobile phone based on the information

provided by Mr. Rizzo.  Attached hereto as Exhibit A[1] and made a part hereof is a true and correct copy of the Search Warrant dated December 7, 2022, signed by Honorable Abigail LeGrow, Judge of the Superior Court of the State of Delaware.

16.    The Search Warrant indicates that the contents of MSgt. Coleman's mobile telephone for the period September 30, 2022, 1200 hours, to October 4, 2022, 2359 hours, the period during which Mr. Rizzo interviewed MSgt. Coleman, were relevant to criminal charges of Hindering Prosecution and Official Misconduct.

17.    On December 8, 2022, an employee of the DDOJ executed the Search Warrant against MSgt. Coleman, as a consequence of which she was placed on Administrative Duty and assigned to the Records Division.  In addition, she was confined to the Police Building, not permitted to leave for lunch, and prohibited from taking anything from her desk other than her personal keys and bag.  These conditions previously had not been imposed on any other police officer placed on Administrative Duty.  For example, Ofc. Hugh Stephey, a White male, was arrested and charged with driving under the influence of alcohol or a controlled substance.  He was placed on Administrative Duty, but allowed to continue to work from his assigned office, wear his police uniform, respond to crime scenes as a forensic technician, and process crime scenes.

---

[1] Exhibit A to Complaint

18.    MSgt. Coleman had been scheduled to be on vacation from December 12, 2022, through January 3, 2023, but began her vacation two (2) days early.

19.    By December 15, 2022, MSgt. Coleman began hearing from numerous officers about personal information that had been contained within her cell phone, such as photographs of her nude and in lingerie, intimate videos of her with her husband, mental health struggles related to her divorce, information identifying her as the source of a picture of a racist trophy given to a Black officer by his White supervisor proclaiming him the "whitest black guy," and text messages discussing how Black officers are treated differently and worse than White officers.  None of these pictures, texts or other information were within the date range of the Search Warrant.

20.    When downloading data from cell phones pursuant to an appropriate warrant, defendant's Forensic Examiners first download the entire contents of the cell phone. They then put the entire extraction report on a flash drive and give the flash drive to the author of the warrant, regardless of the date range specified in the subpoena.  This practice allows the investigator to conduct a fishing expedition with respect to data outside the scope of the warrant.  Once the investigator finds useful information outside the scope of the warrant, they apply for an addendum or a new warrant to retrieve the information they already know exists.  This practice violates the Fourth Amendment rights of the subject of the warrant.

21.     In addition, defendant utilizes several devices that enable it to view the entire contents of a cell phone without detection, such as Graykey and Cellebrite.  For example, Graykey forcibly unlocks a cell phone and allows the investigator to scroll through the phone without leaving any trace that the phone has been unlocked and viewed.

22.     Because defendant has no written policy with respect to the extraction of data from cell phones, investigators are free to take any action they wish in connection with the extraction of data, regardless of whether their actions violate an individual's constitutional rights, and regardless of whether the individual is a defendant or a witness.  The absence of such a policy allowed defendant to violate MSgt. Coleman's rights in connection with the extraction of data from her cell phone.

22.     Cell phones are not consistently logged into evidence through PadTrax, but can often be found unsecured lying out in the open on detectives' desks or placed within the file folder of the specific investigation.  In addition, the phone technicians are not required to sign non-disclosure forms to preserve the confidentiality of the contents of the cell phone.

23.     The Forensic Examiners gave the entire contents of MSgt. Coleman's cell phone that had been downloaded to Lt. Ciber, who in turn provided some or all of the downloaded data to numerous officers who had no legitimate need for or

entitlement to the data, including Lt. Ciber himself, who injected himself into the investigation in retaliation for MSgt. Coleman complaining about the hostile work environment created by Sgt. Fox, Lt. Ciber's friend. Because the cell phone was part of a DDOJ investigation, Lt. Ciber was not entitled to receive any of the cell phone data. Moreover, Mr. Rizzo should have only been given cell phone data within the date range parameters specified in the Search Warrant, not the entire contents of the cell phone.

24.    At this time, a White male Lieutenant Detective told his White male Sergeant, who was also on the promotional list to Lieutenant with MSgt. Coleman, to get his uniform ready because he did not have to worry about MSgt. Coleman being promoted to Lieutenant before him.

25.    It is apparent that the Search Warrant was racially motivated and issued based on the unfounded and unjustified assumption that MSgt. Coleman had contact with someone involved in the Ramadan case after her initial interview with Mr. Rizzo.

26.    The treatment of MSgt. Coleman is reflective of the long-standing racial problems within the WPD Internal Affairs Division and Criminal Investigation Division.

27.    The Internal Affairs Commander and officers assigned to the IA Division are under an obligation to keep investigations confidential. However, the

IA Division Commander, Lieutenant Paul Ciber, has failed to maintain confidentiality on numerous occasions.  He repeatedly has in-depth discussions with the President of the Fraternal Order of Police, Michael Groark, in which he divulges important details of the investigations.  These investigations ultimately could result in the termination of the affected officer, which would create a situation where Mr. Groark would sit as a member of the Appeal Board with a biased point-of-view based on information provided by Lt. Ciber.

28.     These egregious actions constitute a blatant conflict of interest because the affected officer does not receive a fair hearing.

29.     This practice of advising the FOP President of such information violates WPD standards and ultimately may result in liability for the WPD.

30.     Although the DDOJ is the lead investigator in the case involving MSgt. Coleman, IA involved itself in the investigation and disclosed to numerous members of the WPD information that was supposed to be confidential.

31.     When the panel for hearings is selected it should be done with double blind chips with another investigator as witness.  Sergeant Robert Fox never did his drawings in the presence of another investigator and frequently chose whom he wanted on his board rather than by chip selection.

32.     MSgt. Coleman complained to Lt. Ciber about the hostile work environment created by Sgt Fox.  For example,

     a.      If Sgt. Fox asked a question and MSgt. Coleman answered, he would huff and puff and dismiss her answer;

     b.      he would sign other supervisors up for overtime but refused to ask MSgt. Coleman, despite knowing that she routinely worked overtime;

     c.      he would turn the lights off in the office when he knew MSgt. Coleman was still working;

     d.      he would intentionally not speak about his cases, when the practice in IA was to talk about them in the presence of the other investigators to learn their thoughts and points of view;

     e.      he would keep his discipline secret because he discriminated based on race in imposing discipline; Black officers were routinely disciplined more severely than White officers;

     f.      he would not allow MSgt. Coleman to use his work truck;

     g.      MSgt. Coleman was intentionally left out of group chats she learned had been ongoing when other officers would say something about them in the office.

     33.      During IA review of Use of Force reports, Lt. Ciber instructed MSgt. Coleman to justify every use of force, regardless of whether or not it actually was justified. The only Use of Force that was questioned involved Officer Samuel

Waters, and then solely because he was exposed on social media and the local news.

34.    A lieutenant from patrol recently sent up 2 use of force reports where she felt they were not justified. Ciber and Fox immediately said her claim would be unfounded but they would go through the formalities to make it look like they conducted a complete investigation.

35.    Lt. Ciber served a White female Sergeant a Notification of Complaint, which is formal notice to an officer that they are under investigation by IA, for rude and insulting language when she was overheard telling a Black officer that he was the "wrong color" to get excused time, implying the Black officer would have to use his own time to come in late, in contrast to White officers who wouldn't have to use their own time to do so; it would be excused. Instead of investigating the possibility that officers were treated differently based on race, Lt. Ciber chose to ignore the discriminatory practice and discipline the officer who exposed the practice.

36.    A Black female officer complained of harassment by Sgt. Philip McLaughlin, a White male and her supervisor.  Lt. Ciber and Sgt. McLaughlin are friends, and Lt. Ciber cleared the case as unfounded.

37.    Lt. Ciber routinely allowed Sgt. Fox to report for work at 9am and begin overtime at 3pm without using any of his personal time from 7am to 9am to

complete an 8-hour workday prior to working overtime. This constitutes stealing from the City. In contrast, MSgt. Coleman was required to use her personal time in connection with working an extra job or overtime hours.

38.    In June 2007, prior to becoming Commanding Officer of IA, Lt. Ciber was arrested, charged and either found guilty or pled guilty to criminal charges arising from a domestic dispute with his ex-wife involving alcohol and a weapon. On information and belief, Lt. Ciber was suspended for an extended period of time because of this offense.

40.    Prior to being promoted, Lt. Ciber and Sgt. Fox were investigated for the alleged rape of a female employee of the State Attorney General Office. The results of the ensuing investigation are unknown.

42.    Lt. Ciber took action to try to have MSgt. Coleman assigned out of IA. Lt. Ciber asked former Chief Robert Tracy to re-assign MSgt. Coleman, but he denied the request. Lt. Ciber asked the City Law Department to remove MSgt. Coleman from IA as well. The Law Department told Lt. Ciber they did not have the authority to remove her.

43.    MSgt. Coleman was told by a detective in the WPD Criminal Investigation Division and the drug division that detectives routinely examine all of the data in a cell phone and then attempt to connect damning evidence outside the date range of the warrant to data within the date range of the warrant. He

further told her that superior officers are aware of this practice and do nothing to stop it.

44.    In addition, MSgt. Coleman was told by an officer who works the turn key area (where arrested people come to be processed and see a judge) that he has observed officers rummaging through defendants' cell phones, and when they find incriminating evidence they apply for a warrant for the phone.

45.    The WPD has a long history of discrimination against Black officers, in particular when it was led by then Inspector Cecelia Ashe, who cultivated and promoted a culture within WPD that caused a racial divide and a racially hostile work environment:

a.    Insp. Ashe convinced former Chief Tracy to give her control over 90% of the WPD. She had approximately 300 officers assigned to her, while the only other Inspector, a Black male, had 10 officers assigned to him;

b.    WPD had an officer involved shooting, during the investigation of which it was discovered that the ballistic evidence didn't match.  The shell casings and the gun did not match during a test fire.  The officer involved, a White male, had switched the barrel of his gun after the shooting but prior to his gun being taken as evidence.  Insp. Ashe was notified about his actions early in the investigation, but she failed to disclose this evidence to the AG's Office until more

than a year later, and then only because the AG's found out on their own about the switch and began investigating it.

      c.     Insp. Ashe filed a sexual harassment complaint against a supervising officer, but the written account she provided was contradicted by indisputable video evidence. She was never charged with dishonesty, nor were her actions investigated.

      d.     Insp. Ashe never notified Chief Tracy about the investigation of MSgt. Coleman. She made the decision to move forward with the investigation even though she no longer supervised Detectives. In addition, she did not inform the other inspector because he is Black and she believed he would've told MSgt. Coleman about the investigation because she also is Black.

      e.     Insp. Ashe covered for a White male detective Lieutenant who recorded a video mocking Chief Tracy and telling him to suck his d***.

      f.     A unit under Insp. Ashe's leadership, the Street Crimes Unit, was supervised by a White male sergeant who in meetings, routinely stated that he and his officers were going to go hunting for Black wanted suspects. The Street Crimes Unit referred to themselves as the "Heavy Hitters."

      46.     Mr. Goark, the FOP president, told officers that if MSgt. Coleman did not retire, she would be arrested on criminal charges of official misconduct and hindering prosecution arising from the illegal search warrant, and then terminated

14

internally for violation of Obedience to Laws, which states in part that an officer can be terminated if they are merely arrested for criminal charges, and that once she was terminated from the WPD the criminal charges would be dropped.

47.    WPD has a long history of discrimination against Black officers.  For example:

b.    A Black K-9 officer instructor, who is certified, recently was replaced by a White K-9 officer who is not certified.  Nor does he have sufficient K-9 training to teach. The Black   K-9 officer had both. The former K-9 supervisor is a White male who, prior to being promoted to sergeant, was removed as a K-9 handler for mistreating a dog.  A short time after the promotion, he was re-assigned to the K-9 unit as a supervisor and received on-call compensation (12 hours compensatory time) every weekend;

c.    A White k-9 supervisor served a Black K-9 officer with an internal disciplinary charge for calling out sick when he was not sick.  However, he has had conversations with White K-9 officers who tell him they are going to call out sick in order to have the day off.  The White officers have never received internal disciplinary charges for improperly calling out sick;

d.    A Black female Master Sergeant who is a member of the Hostage Negotiation Unit was passed over for command of the Hostage Negotiation Unit in favor of a more junior White female sergeant.  Traditionally, the highest-ranking

officer in the unit was selected to lead the unit. Because of being passed over for

the command position, the Black female Master Sergeant relinquished her position

in the Hostage Negotiation Unit;

      e.     A Black female member of the Critical Incident Stress Management

(CISM) Unit was intentionally excluded from the CISM group chat. She

complained about this discriminatory treatment, and in response she was placed in

the call out group text, which is not the CISM group chat. She ultimately left the

CISM team. All of the current members of the CISM unit are White;

      f.     A Black female Sergeant was chosen by a Black female captain to be

transferred to the Criminal Investigations Division (CID). Inspector Ashe told the

Black female Captain and the Black female sergeant that she could not be

transferred to CID because she would "fall on her face" because she has no

investigative experience. The Black female Master Sergeant was then assigned to

investigate officers in IA;

      g.     A Black female detective in the Vice Unit was transferred out of the

unit because she spoke out against officers within the unit who were constantly

using the "N" word. The Black female detective was intentionally not provided

passwords to specific programs that would have allowed her to efficiently conduct

investigations and do her job for over 3 years. She was ultimately transferred to

patrol by Inspector Ashe and replaced by a White female officer;

h.      A Black female officer was told by her White male supervisor not to request a transfer to the Vice Unit because it already has its "token" Black officer in the unit.  The same Black female officer dyed her hair blonde, and thereafter was referred to as Dennis Rodman by a White male supervisor;

i.      A Black male officer tried out for the SWAT Unit when there were several openings.  A successful candidate must pass a physical fitness test, and a candidate is only given one attempt to pass the test.  However, two White officers failed the physical fitness test and were allowed to retake it.  The Black was not selected for one of the openings, allegedly because he did not interview well.  The White officers who did not perform well during the testing process (the firing range, SWAT school) were allowed to join the unit subject to a probationary period. The Black officer was the only officer not selected to be a member of SWAT.  The SWAT Unit is comprised of approximately 35 males, only two of whom are Black;

j.      Inspector Ashe told a Black female civilian who was about to use the bathroom in the Chief's common area, "you can't use this bathroom. The bathroom for peasants is out in the hallway";

k.      A Black officer was permitted to attend Certified Instructors training. When a White Inspector got knowledge of him attending, she complained to the Chief and demanded that an investigation be started because a Black captain who

was assigned to HR allegedly sent the Black officer to training without proper paperwork.  In connection with a subsequent Certified Instructors course, two White male officers were chosen by the same HR captain, and there were no issues;

      l.     A Black female officer was recommended by her supervisors (Sergeant, Lieutenant, and Captain) to be considered for transfer to the Detectives Unit.  Supervisors in the Detectives Unit selected her for transfer, but Inspector Ashe removed her from the transfer list for no reason.  This officer had requested a transfer to the Detectives Unit three times;

      m.     There are no Black supervisors assigned to the CID;

      n.     There are no Black supervisors in the Vice Unit.  Of the 20 officers assigned to the Vice Unit, only 1 is Black;

      o.     Under Insp. Ashe, all of the Sector Captains, the least desired position for a Captain, are minority officers;

      p.     The Chief's Aide, Sgt. Monet Cintron, was instructed to keep notes and record audio on Inspector Emory, a Black male, at the direction of Inspector Ashe . She was told to keep notes of all his mistakes or actions that Insp. Ashe deemed mistakes. The purpose of the note-taking was to build a case against Insp. Emory to effectuate his removal. As soon as Sgt. Cintron learned of the reason for the note-taking, she discontinued doing so;

r.      Insp. Ashe created the Real Time Crime Center and placed only White males within the unit, and gave them 12 hours on-call compensatory time every weekend;

t.      A Black female Captain was assigned to CID.  Insp. Ashe overloaded her with work and assigned her to perform tasks that typically are done by lieutenants and sergeants.  The Black female captain became so overwhelmed to the point where she retired. She was replaced by a White male captain who had all of the petty tasks the Black captain was given taken away from him by Insp. Ashe because she said those tasks were not a captain's responsibility; and

u.      Insp. Ashe routinely refused to transfer Black officers to specialized units.

48.      The facts described above establish that defendant discriminated against MSgt. Coleman because of her race, retaliated against her, racially harassed her, and subject her to a hostile work environment.

49.      The discrimination, harassment and retaliation MSgt. Coleman endured was unwelcome, severe, pervasive, and regular, and became the usual manner in which she was treated by defendant.

50.      MSgt. Coleman was detrimentally affected by defendant's discrimination, retaliation, and harassment, all of which caused her unjustified mental and emotional stress and impeded her professional development.

51.     Defendant does not have effective racial harassment or nondiscrimination policies and procedures.  In fact, defendant has not established any meaningful policies, procedures, practices, or controls to ensure equal employment opportunity and nondiscrimination within the workplace.

52.     As a direct and proximate result of the hostile work environment in which MSgt. Coleman worked and defendant's above-described retaliation, race discrimination and racial harassment, MSgt. Coleman suffered severe emotional distress and mental anguish.

53.     As a direct and proximate result of the hostile environment in which MSgt. Coleman worked and defendant's above-described retaliation, race discrimination and racial harassment, MSgt. Coleman lost wages, benefits, and incurred other compensable losses and compensatory damages.

54.     MSgt. Coleman has suffered, is now suffering and will continue to suffer emotional distress, mental anguish, loss of enjoyment of life and other non-pecuniary losses as a direct and proximate result of defendant's discrimination, retaliation, and harassment.

55.     Defendant discriminated and retaliated against MSgt. Coleman, and harassed and subjected her to a hostile work environment because of her race and pursuant to its history, pattern and practice of discriminating against Black officers of all ranks.

56.    By reason of defendant's discrimination, retaliation, and harassment, MSgt. Coleman suffered extreme harm, including loss of income and other employment benefits, loss of professional opportunities, embarrassment and humiliation.

57.    Defendant acted and failed to act willfully, maliciously, intentionally and with reckless disregard for MSgt. Coleman's rights.

## COUNT I

### *The Civil Rights Act of 1866, 42 U.S.C. §1981*

58.    Plaintiff restates and realleges paragraphs 1-57, inclusive, as though set forth here in full.

59.    MSgt. Coleman had a federal statutory right under the Civil Rights Act of 1866, 42 U.S.C. §1981 ("Section 1981"), as amended, to be accorded the same rights as were enjoyed by White employees and applicants with respect to the terms and conditions of their employment relationship with defendant and to the enjoyment of all benefits, privileges, terms and conditions of that relationship.

60.    Defendant's conduct described above deprived MSgt. Coleman of the rights, privileges and immunities guaranteed to her under Section 1981.

61.    By reason of defendant's conduct, MSgt. Coleman is entitled to all legal and equitable relief available under Section 1981.

## COUNT II

### *Fourth Amendment*

62.    Plaintiff restates and realleges paragraphs 1-61, inclusive, as though set forth here in full.

63.    By virtue of defendant's conduct described above in connection with and pursuant to the Search Warrant, defendant violated MSgt. Coleman's right to be free from unreasonable searches and seizures under the Fourth and Fourteenth Amendments to the United States Constitution.

64.    As a direct and proximate result of defendant's violation of MSgt. Coleman's rights protected by the Fourth and Fourteenth Amendments to the United States Constitution, MSgt. Coleman suffered the damages and injuries described above.

65.    By reason of defendant's violation of MSgt. Coleman's rights protected by the Fourth and Fourteenth Amendments to the United States Constitution, MSgt. Coleman is entitled to recover all damages available therefor, and to all equitable relief arising therefrom.

### *Jury Demand*

66.    MSgt. Coleman hereby demands a trial by jury as to all issues so triable.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff, Fray Coleman, respectfully prays that the Court:

a.    adjudge, decree and declare that defendant has engaged in illegal race discrimination, retaliation, and harassment, and that the actions and practices of defendant complained of herein are violative of her rights under Section 1981;

b.    adjudge, decree and declare that defendant has violated MSgt. Coleman's rights under the Fourth and Fourteenth Amendments to the United States Constitution;

c.    enter judgment in favor of MSgt. Coleman and against defendant for all available remedies and damages under law and equity, including, but not limited to, back pay, front pay, reinstatement, compensatory damages, punitive damages, past and future mental anguish and pain and suffering, in amounts to be determined at trial;

d.    order defendant to pay the attorney's fees, costs, expenses and expert witness fees of MSgt. Coleman associated with this case under 42 U.S.C. Section 1981a and 42 U.S.C. Section 1988;

e.    grant such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable; and

f.    retain jurisdiction until such time as the Court is satisfied that

defendant has remedied the unlawful and illegal practices complained of herein

and is determined to be in full compliance with the law.

**KATE BUTLER LAW LLC**

By: /s/Kate Butler_____
Kate Butler
1509 Gilpin Avenue, Suite 3
Wilmington, DE, 19806
T: (302)-966-9994
kate@katebutlerlaw.com
*Local Counsel*

Robert T Vance Jr
Law Offices of Robert T Vance Jr
100 South Broad Street - Suite 905
Philadelphia PA 19110
215 557 9550 tel / 215 278 7992 fax
rvance@vancelf.com

*Attorney for Fray Coleman, pro hac vice\*\**
\*\*Motion for admission pending