**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| FRAY COLEMAN | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 23-425-MAK |
| | : | |
| CITY OF WILMINGTON | : | |

## MEMORANDUM

**KEARNEY, J.**                                                        **December 28, 2023**

A Black Wilmington police officer claims she left her employment as a police officer earlier this year because of a culture of race discrimination in the Wilmington Police Department created by an inspector. She does not sue her employer under federal or state employment law for discrimination in employment. She instead sues the City employer claiming a police inspector is the "*de facto*" policymaker who creates and promotes race discrimination and later directed issuance of a search warrant approved by a judge for her cell phone. She also admits the Chief of Police makes the final decisions. We issued extensive guidance when dismissing her first attempt at alleging civil rights liability upon the City. We afforded her a second opportunity to plead how the identified inspector could be the final decisionmaker necessary to impose municipal civil rights liability upon the City. Her second attempt to plead the City violated the civil rights laws based on an inspector's racial animus again does not state a civil rights municipal liability claim. She also again did not plead a basis for challenging the search warrant for her phone as approved by a judge. We dismiss her amended Complaint with prejudice.

# I.    Alleged facts.

Fray Coleman worked for the City of Wilmington Police Department as a police officer beginning in June 1999. She sues the City for violating her civil rights through an internal police investigation she believes is motivated by a police inspector's race discrimination against Black officers.

Chief Robert Tracy served as the Wilmington Chief of Police during Ms. Coleman's tenure.[1] Inspector Charles Emory ran the Criminal Investigations Division.[2] But Inspector Cecelia Ashe served as the "*de facto* final decision-maker" for the Wilmington Police Department even though she did not run the Criminal Investigations Division during the investigation of Ms. Coleman.[3] Inspector Ashe possessed "final unreviewable authority concerning personnel and disciplinary decisions" and implemented a policy of race discrimination in the Wilmington Police Department.[4] Inspector Ashe shielded Chief Tracy from the investigation of Ms. Coleman and "controlled the flow of information to Chief Tracy."[5] Inspector Ashe approved the investigation of Ms. Coleman because of the Wilmington Police Department's "policy, practice and/or custom of race discrimination."[6]

### *The Wilmington Police Department interviews Ms. Coleman in 2007 and 2008.*

Ms. Coleman's claims arise from a 2022 investigation into murders over fifteen years ago.

Police officers first interviewed Ms. Coleman in 2007 related to the then-recent murder of her daughter's biological father's friend.[7] Ms. Coleman then told the police officers it would not surprise her if someone killed a murder suspect named Ramadan because of Ramadan's connection to the murder.[8] Ms. Coleman believed someone would murder Ramadan because of

Ms. Coleman's knowledge of the "law of the streets" requiring a retribution killing.[9] Ms. Coleman did not know someone would murder Ramadan.[10]

Someone later murdered Ramadan in February 2008.[11] City detectives then questioned Ms. Coleman about Ramadan's murder in early 2008.[12] Ms. Coleman told the detectives she had no information about Ramadan's murder.[13]

### The City renewed its investigation in 2022 leading to a search warrant for Ms. Coleman's phone.

The City renewed looking into these cold murder cases in 2022. It hired a retired state trooper to twice interview Ms. Coleman about the 2008 Ramadan murder contravening the Wilmington Police Department's Standard Operating Procedure and Delaware law.[14] The state trooper did not advise Ms. Coleman of her *Miranda* rights before either interview.[15] The state trooper did not advise Ms. Coleman she could leave during either interview.[16]

The state trooper told Ms. Coleman she had an inconsistent recollection of the murder after the second interview.[17] Inspector Ashe decided to ask the Delaware Department of Justice to seek a search warrant.[18] Inspector Ashe authorized the state trooper to prepare a search warrant for Ms. Coleman's cell phone.[19] The search warrant covered the time between Ms. Coleman's first and second interviews in 2022.[20] The state trooper used the improperly obtained information from his interviews with Ms. Coleman to apply for a search warrant to search Ms. Coleman's cell phone on December 7, 2022.[21] Judge LeGrow found probable cause necessary to approve the warrant.[22]

A Delaware Department of Justice employee executed the search warrant for Ms. Coleman's cell phone on December 8, 2022.[23] The City thereafter placed her on Administrative Duty and prevented her from leaving the police building.[24] Wilmington police officers later

discussed Ms. Coleman's personal information and pictures on her cell phone created outside the warrant's date range.[25]

The City constructively discharged her on January 3, 2023 after an internal investigation.[26]

### Ms. Coleman sued the City, its Office of Public Safety, and the Wilmington Police.

Ms. Coleman sued the City, its Office of Public Safety, and its Police Department under the civil rights laws arising from her January 3, 2023 discharge.[27] Ms. Coleman alleged the City violated federal civil rights law confirmed under section 1981 by treating Ms. Coleman and other Black officers differently than white officers in the terms of their employment. She alleged the Police Department fired her because the City, Office of Public Safety, and the Police Department engage in a policy of racial discrimination against Black officers.[28] Ms. Coleman also alleged the City violated her Fourth and Fourteenth Amendment rights under section 1983 by executing on a racially motivated search warrant.

We dismissed Ms. Coleman's claims against the Office of Public Safety and the Wilmington Police Department with prejudice because the Office of Public Safety and the Wilmington Police Department are administrative arms of the City and cannot be sued.[29] We dismissed Ms. Coleman's section 1981 claim against the City with prejudice because Congress did not create a private cause of action under section 1981 to sue state actors.[30] We dismissed Ms. Coleman's Fourth Amendment claim against the City without prejudice allowing Ms. Coleman leave to amend because she failed to plead deficiencies in the search warrant or the process of obtaining it.[31] We dismissed Ms. Coleman's Fourteenth Amendment claim against the City without prejudice allowing Ms. Coleman leave to amend because she failed to plead Inspector Ashe is the final policymaker for the Wilmington Police Department.[32]

## II.  Analysis

Ms. Coleman timely amended a portion of her allegations to sue the City alone for the same two civil rights claims.[33] She does not bring an employee-based termination claim under federal law (i.e. Title VII) or state employment law.[34]  She instead looks to the federal civil rights law codified by Congress in section 1983. She again alleges the City violated her "federal constitutional and statutory right" to be free from a "municipal policy, practice and/or custom of racial discrimination against Black police officers."[35] Ms. Coleman alleges Inspector Ashe created this policy of race discrimination as the Police Department's "*de facto* final decision-maker" with "final unreviewable authority."[36] Ms. Coleman also alleges the City violated her Fourth Amendment rights when the state trooper used information from his "illegal and improper interviews" of Ms. Coleman and therefore "knowingly and deliberately, and with a reckless disregard for the truth, made false statements that created a falsehood" to obtain a search warrant for Ms. Coleman's phone.[37]

The City moves to dismiss Ms. Coleman's section 1983 race discrimination claim and her section 1983 Fourth Amendment claim.[38] The City argues Ms. Coleman's section 1983 race discrimination claim fails because, among other reasons, Ms. Coleman fails to plead Inspector Ashe is a final policymaker necessary to attach liability for Ms. Coleman's constructive discharge.[39] The City argues Ms. Coleman's section 1983 Fourth Amendment claim fails because Ms. Coleman does not allege a false statement the state trooper made in obtaining the search warrant and the state trooper's alleged use of Ms. Coleman's statements without giving a *Miranda* warning is not actionable.[40]

We dismiss Ms. Coleman's section 1983 race discrimination claim as Ms. Coleman again fails to plead facts allowing us to plausibly infer Inspector Ashe is the final policymaker for the

Wilmington Police Department. We dismiss Ms. Coleman's section 1983 Fourth Amendment claim because Ms. Coleman again fails to plead the state trooper made false statements to obtain the search warrant or otherwise challenge the warrant's veracity.

### A.  We dismiss Ms. Coleman's section 1983 race discrimination claim.

Ms. Coleman claims the Wilmington Police Department harmed her by causing her to leave her job through its "policy, custom and/or practice" of race discrimination against Black police officers.[41] Ms. Coleman claims Inspector Ashe served as the "*de facto* final decision-maker" at the Wilmington Police Department.[42] Ms. Coleman alleges Inspector Ashe had "final unreviewable authority" over Police Department personnel and disciplinary decisions.[43] Ms. Coleman claims Inspector Ashe "implemented" the policy, practice and custom of race discrimination within the Wilmington Police Department.[44] Ms. Coleman explains Inspector Ashe "controlled the flow of information" to Wilmington Police Chief Tracy.[45]

The City counters Ms. Coleman fails to plead municipal liability because Ms. Coleman swears Inspector Ashe is the "*de facto*" final policymaker and admits she reported to Wilmington Police Chief Tracy.[46]

We dismiss Ms. Coleman's section 1983 race discrimination claim as she cannot plead Inspector Ashe is the final policymaker.

Our Supreme Court teaches municipal entities can only be liable for their employees' section 1983 violations if the former police officer pleads the municipal entity's "policy or custom" caused the former police officer's constitutional harm.[47] Our Court of Appeals instructs municipal liability attaches where a state actor employee with "final policymaking authority" engages in the harmful conduct.[48] This employee's conduct represents the municipal entity's "official policy" by virtue of the employee's "final policymaking authority."[49] Our Supreme

Court instructs municipal liability cannot attach to the actions of "*de facto*" policymakers.[50] Possessing discretionary authority in one arm of a municipal entity "does not, without more, give rise to municipal liability based on an exercise of that discretion."[51]

Our Court of Appeals requires aggrieved employees pleading an individual possesses final policymaking authority to plead consistent with Rule 11 (1) "as a matter of state law, the official is responsible for making policy in the particular area of municipal business in question, and (2) . . . the official's authority to make policy in that area is *final and unreviewable*."[52] Employee handbooks are also instructive in the absence of a state statute for defining which police department employees serve as policymakers for *Monell* purposes.[53]

Judge Robreno's dismissal of municipal liability claims because the incarcerated person failed to plead the Commissioner and Warden of the Pennsylvania prison system served as final policymakers assists in our analysis.[54] The incarcerated person in *Buoniconti* suffered injuries requiring hospitalization after two incarcerated persons assaulted him at a detention center.[55] The injured incarcerated person sued the Warden and Commissioner of the Philadelphia Prison System alleging the two established the Philadelphia Prison System's "policies or customs which ultimately led to [the incarcerated person's injuries]."[56] Judge Robreno dismissed the incarcerated person's municipal liability claim explaining Pennsylvania law established the Prison Board as the "authorized policymaker" for ensuring the "safekeeping, discipline and employment of inmates."[57]

We remain persuaded by Judge Surrick's analysis denying dismissal of municipal liability claims implicating borough mayors as "policymakers" responsible for firing a police clerk.[58] The police clerk in *Bilal* prepared disciplinary paperwork for two Borough police officers.[59] The two police officers allegedly colluded with the Borough mayors to arrest the

police clerk and prevent the disciplinary hearing.[60] The police department fired the police clerk without explanation six months after her arrest.[61] The police clerk sued the Borough arguing the mayors operated as policymakers because their involvement in her firing dictated the police department's decision to fire her.[62] Judge Surrick noted courts reviewing policymaker claims "must look to state and local laws."[63] Judge Surrick found Pennsylvania state law generally vests mayors with the "full charge and control of the chief of police and the police force" and held the police clerk adequately pleaded municipal liability claims against the Borough.[64]

We are mindful both Judges Robreno and Surrick evaluated final policymaker status necessary for municipal liability under Pennsylvania Law. So we look to Delaware Law today. Judge Burke's dismissing municipal liability claims after examining Delaware law for instruction on policymaker status also guides our decision.[65] The teacher in *Keeton* alleged the Principal of the technical school committed copyright infringement by photo-copying textbooks.[66] The teacher accused the Principal of copyright infringement and the Principal recommended the director of the technical school district not renew the teacher's contract.[67] The teacher sued the Principal, the director, and the board of education for the technical school district alleging municipal liability claims.[68] The teacher alleged the Principal served as the final policymaker because the Principal "regularly made decisions about hiring, firing, and failing to renew contracts of employees."[69] Judge Burke reviewed Delaware state law and held the Board, not the Principal, served as the final policymaker because Delaware law granted the Board "the authority to determine policy and adopt rules and regulations for the general administration and supervision" of the school district.[70]

Delaware law does not allow us to find police inspectors are the final policymakers for police departments. Judges Surrick and Robreno looked to Pennsylvania law in *Bilal* and

8

*Buoniconti* to determine the pleaded municipal employee's status as a final policymaker. We, like Judge Burke, must look to Delaware law or the Wilmington Police Department's internal guidance to determine whether a police inspector can be a final policymaker for *Monell* liability. The Wilmington Police Department directive identifies the Chief of Police as the "Chief Executive Officer" of the Police Department and confirms granting the Chief of Police "the final authority in all matters pertaining to the department."[71] Ms. Coleman confirms the line of authority and reinforces the Police Department directive by pleading Inspector Ashe "controlled the flow of information to Chief Tracy."[72] Ms. Coleman admits information funneled up to Chief Tracy for his final approval and decision.

Ms. Coleman does not follow our Court of Appeals's requirement to find state law demonstrating the pleaded supervisor operates as the final policymaker for the relevant municipal entity.[73] Ms. Coleman again fails to plead Inspector Ashe is the final policymaker for the Wilmington Police Department. Ms. Coleman pleads Inspector Ashe is the "*de facto*" final policymaker for the Wilmington Police Department.[74] Our Supreme Court instructs we dismiss municipal liability claims where the aggrieved former municipal employee pleads a supervisor is the "*de facto*" policymaker for the relevant municipal entity.[75] We cannot allow Ms. Coleman to proceed on her municipal liability claim pleading a "*de facto*" policymaker. Her theory of a "*de facto*" policymaker is not sufficient as a matter of established law.

We dismiss Ms. Coleman's section 1983 race discrimination claim for again failing to plead a final policymaker.

**B.  We dismiss Ms. Coleman's section 1983 Fourth Amendment claim.**

Ms. Coleman again alleges there existed no probable cause supporting the search warrant because the state trooper conducted "illegal and improper interviews" with Ms. Coleman to

obtain the information used to obtain the search warrant.[76] Ms. Coleman claims the state trooper's failure to advise Ms. Coleman of her *Miranda* rights during their interviews "indicates that the affidavit and/or application/complaint were false and thus did not establish probable cause."[77] Ms. Coleman does not specifically direct us to false content in the affidavit of probable cause.[78] The City counters, among other things, a failure to provide *Miranda* warnings is not actionable unless the interviewer adduces the custodial statements at trial.[79]

We dismiss Ms. Coleman's section 1983 Fourth Amendment claim with prejudice because she again fails to allege a false statement in the affidavit of probable cause.

Valid search warrants must be "1) be based on probable cause; 2) be supported by a sworn affidavit; 3) describe particularly the place of the search; and 4) describe particularly the persons or things to be seized."[80] As our Supreme Court taught years ago in *Franks v. Delaware,* a person subject to the warrant later challenging a warrant affidavit's truth must allege "(1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions are material, or necessary, to the finding of probable cause."[81] Our Court of Appeals instructs *Miranda* violations cannot serve as the basis for civil claims unless the statements obtained are adduced at trial against the speaker.[82]

We again dismiss Ms. Coleman's section 1983 Fourth Amendment claim for failing to allege false statements in obtaining the search warrant. Ms. Coleman's allegations deal more in the state trooper's conduct of the interviews than in false statements or omissions employed to obtain the search warrant.[83] She pleads improperly conducted interviews necessarily led to the state trooper using false statements to obtain the search warrant.[84] But Ms. Coleman does not allege what statements the state trooper made to obtain the search warrant, let alone whether

those statements misrepresented her answers from their two interviews. Ms. Coleman conflates allegedly improper interview conduct with using false statements. We cannot connect the dots for Ms. Coleman.

Ms. Coleman also alleges her answers to the state trooper's interview questions lacked *Miranda* protection.[85] But Ms. Coleman has not been charged of a crime, let alone stood trial. Her section 1983 Fourth Amendment claim concerning the failure to give *Miranda* warnings is premature.

## III.   Conclusion

Ms. Coleman did not cure the deficiencies in her Complaint through her amended Complaint. She still does not plead a final policymaker established a policy of race discrimination towards Black officers. She instead continues to rely on a "*de facto*" policymaker in the role of an inspector when she also swears the Police Chief makes the final decisions. Her efforts to craft a policymaker status on the inspector is contrary to Delaware Law. She also does not plead a basis to challenge the search warrant for her phone as approved by a judge under the Fourth Amendment. We grant the City's Motion to dismiss.

---

[1] D.I. No. 22 ¶¶ 28, 32, 33d, 33e, 63a, 63d.

[2] *Id.* ¶ 28.

[3] *Id.* ¶¶ 28, 33.

[4] *Id.* ¶¶ 33b-33c.

[5] *Id.* ¶ 33d.

[6] *Id.* ¶¶ 44-45.

[7] *Id.* ¶ 9.

[8] *Id.*

[9] *Id.* ¶ 10

[10] *Id.*

[11] *Id.* ¶ 11.

[12] *Id.*

[13] *Id.*

[14] *Id.* ¶ 13-18.

[15] *Id.* ¶ 20.

[16] *Id.* ¶ 21.

[17] *Id.* ¶ 19.

[18] *Id.* ¶ 29.

[19] *Id.* ¶ 44.

[20] *Id.* ¶ 30.

[21] *Id.* ¶¶ 23, 24-26.

[22] *Id.* ¶ 23.

[23] *Id.* ¶ 31.

[24] *Id*. Ms. Coleman alleges the City does not impose these restrictions on white police officers on Administrative Duty. *Id.*

[25] *Id.* ¶ 35.

[26] *Id.* ¶ 8.

[27] D.I. No. 1.

[28] *Id.* ¶¶ 58-61.

[29] *Coleman v. City of Wilmington*, No. 23-425, 2023 WL 5850804, at *3 (D. Del. Sept. 11, 2023).

---

[30] *Id.* at *3-4.

[31] *Id.* at *4-5.

[32] *Id.* at *5 n. 48.

[33]  D.I. No. 22-1.

[34] *See Daoud v. City of Wilmington*, 894 F. Supp. 2d 544 (D. Del. 2012) (reviewing Title VII claims against the City of Wilmington).

[35] D.I. No. 22 ¶ 76.

[36] *Id.* ¶¶ 33, 33b.

[37] *Id.* ¶¶ 24, 26.

[38] A party seeking relief through a complaint must state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The purpose of Rule 12(b)(6) is to test the sufficiency of the factual allegations in a complaint. *Sanders v. United States*, 790 F. App'x 424, 426 (3d Cir. 2019). If a plaintiff is unable to plead "enough facts to state a claim to relief that is plausible on its face," the court should dismiss the complaint. *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Kajla v. U.S. Bank Nat'l Ass'n as Tr. for Credit Suisse First Boston MBS ARMT 2005-8*, 806 F. App'x 101, 104 n.5 (3d Cir. 2020) (quoting *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Klotz v. Celentano Stadtmauer and Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). While "[t]he plausibility standard is not akin to a 'probability requirement,'" it does require the pleading show "more than a sheer possibility … a defendant has acted unlawfully." *Riboldi v. Warren Cnty. Dep't of Human Servs. Div. of Temp. Assistance & Soc. Servs.*, 781 F. App'x 44, 46 (3d Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678). "A pleading that merely 'tenders naked assertion[s] devoid of further factual enhancement' is insufficient." *Id.* (quoting *Iqbal*, 556 U.S. at 668).

In determining whether to grant a Rule 12(b)(6) motion, "we accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the plaintiff" but "disregard threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements." *Robert W. Mauthe, M.D., P.C. v. Spreemo, Inc.*, 806 F. App'x 151, 152 (3d Cir. 2020) (quoting *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878–79 (3d Cir. 2018)). Our Court of Appeals requires us to apply a three-step analysis to a 12(b)(6) motion: (1) we "'tak[e] note of the elements a plaintiff must plead to state a claim'"; (2) we "identify allegations that … 'are not entitled to the assumption of truth' because those allegations 'are no more than conclusion[s]'"; and, (3) "'[w]hen there are well-pleaded factual allegations,' we 'assume their veracity' … in addition to assuming the veracity of 'all reasonable inferences that can be drawn from' those allegations … and, construing the allegations and reasonable

13

inferences 'in the light most favorable to the [plaintiff]'…, we determine whether they 'plausibly give rise to an entitlement to relief.'" *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021) (internal citations omitted); *Connelly v. Lane Constr. Corp*., 809 F.3d 780, 787 (3d Cir. 2016).

[39] D.I. No. 24 at 21-23.

[40] *Id.* at 10-17.

[41] D.I. No. 22 ¶ 7.

[42] *Id.* ¶ 33.

[43] *Id.* ¶ 33b.

[44] *Id.* ¶ 33c.

[45] *Id.* ¶ 33d.

[46] D.I. No. 24 at 21-22.

[47] *Monell v. Dep't  of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).

[48] *Hill v. Borough of Kutztown*, 455 F.3d 225, 245 (3d Cir. 2006).

[49] *Id.*

[50] *City of St. Louis v. Praprotnik*, 485 U.S. 112, 131 (1988); *see also Keeton v. Bd. of Educ. of Sussex Tech. Sch. Dist.*, No. 15-1036, 2016 WL 5938699, at *9 (D. Del. Oct. 12, 2016).

[51] *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-83 (1986).

[52] *Hill*, 455 F.3d at 245 (emphasis in original).

[53] *Hernandez v. Borough of Palisades Park Police Dep't*, 58 Fed. App'x 909, 913 (3d Cir. 2003).

[54] *Buoniconti v. City of Philadelphia*, 148 F. Supp. 3d 425 (E.D. Pa. 2015).

[55] *Id.* at 431.

[56] *Id.* at 437.

[57] *Id.* (quoting 61 PA. STAT. AND CONS. STAT. ANN. § 1731(a)(3)).

---

[58] *Bilal v. Colwyn Borough*, No. 14-5438, 2017 WL 3675382 (E.D. Pa. Aug. 25, 2017). We directed Ms. Coleman to Judge Surrick's decision in *Bilal* in our September 11, 2023 Memorandum dismissing her municipal liability claim. *Coleman v. City of Wilmington*, No. 23-425, 2023 WL 5850804, at *5 n. 48 (D. Del. Sept. 11, 2023). She elected to not remedy the pleading deficiency.

[59] *Id.* at *1.

[60] *Id.*

[61] *Id.*

[62] *Id.* at *10.

[63] *Id.*

[64] *Id.* (citing 9 PA. CONS. STAT. ANN. § 1123.1(c)).

[65] *Keeton v. Bd. of Educ. of Sussex Tech. Sch. Dist.*, No. 15-1036, 2016 WL 5938699 (D. Del. Oct. 12, 2016).

[66] *Id.* at * 1.

[67] *Id.* at *2.

[68] *Id.* at *9.

[69] *Id.* at *1.

[70] *Id.* at *9 (citing DEL. CODE ANN. TIT. 14, § 1043).

[71] WILMINGTON POLICE DEPARTMENT DIRECTIVE 1.2 (2016), https://www.wilmingtonde.gov/home/showpublisheddocument/9283/637286023712330000. We may consider the Wilmington Police Department Directive. We generally consider only the allegations contained in the complaint, exhibits attached to the complaint, and matters of public record. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)). An exception to the rule is a "document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *Id.* (cleaned up) (emphasis in original). Here, the Wilmington Police Department's Directive is integral to Ms. Coleman's allegation Inspector Ashe is a policymaker.

[72] D.I. No. 22 ¶ 33d.

[73] *See* D.I. No. 22.

[74] D.I. No. 22 ¶ 33.

[75] *City of St. Louis v. Praprotnik*, 485 U.S. 112, 131 (1988).

[76] *Id.* ¶ 24.

[77] *Id.* ¶¶ 20, 25. Ms. Coleman alleges State Trooper Rizzo violated Delaware law by interviewing Ms. Coleman without another Wilmington Police officer present. *Id.* ¶ 20. She does not seek a remedy for this allegation. The Delaware statutes Ms. Coleman details in her amended Complaint pertain to police officer due process rights when terminated or disciplined. DEL. CODE ANN. TIT. 11, § 9200. Ms. Coleman does not plead employment claims concerning her placement on administrative duty, discipline, constructive discharge, termination. *See* D.I. No. 22. Nor does she tie an alleged violation of section 9200 to her placement on administrative duty or constructive discharge. *Id.* Delaware courts apply section 9200 when reviewing employment claims. *See Mock v. Div. of State Police, Dep't of Safety & Homeland Sec.*, No. 2019-0229, 2022 WL 1744439 (Del. Ch. May 31, 2022). Ms. Coleman instead pleads constitutional claims. We cannot construe her references to section 9200 as employment claims within our subject matter jurisdiction concerning these alleged adverse employment actions.

[78] *See* D.I. No. 22.

[79] D.I. No. 24 at 17.

[80] *United States v. Baker*, 563 F. Supp. 3d 361, 372 (M.D. Pa. 2021) (citing *Groh v. Ramirez*, 540 U.S. 551, 557 (2004)).

[81] *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997) (citing *Franks v. Delaware*, 438 U.S. 154, 171-72 (1978)).

[82] *Ojo v. Luong*, 709 F. App'x 113, 117-18 (3d Cir. 2017).

[83] D.I. No. 22 ¶¶ 20-21, 24-26.

[84] D.I. No. 22 ¶¶ 25-26.

[85] *Id.* ¶ 20.